THE TERRELL LAW GROUP
REGINALD TERRELL SB# 127874
223 25th Street
Richmond, CA 94804
Telephone: 510-237-9700
Facsimile: 510-237-4616

AMAMGBO & ASSOCIATES
DONALD AMAMGBO
7901 Oakport, Suite 4900
Oakland, CA 94621
Telephone: 510-615-6000
Facsimile: 510-615-

BLACKWELL & BLACKWELL
JUDITH BLACKWELL
584 Valla Vista Avenue
Oakland, CA 94610
Telephone: 835-2848

Lawrence D. NWAJEI
LAW OFFICES OF NWAJEI & COMPANY
4221 Wilshire Blvd., Suite 392
Los Angeles, CA 90010
Telephone: 323-549-0201
Facsimile: 323-549-0211

E-filing

Attorneys for Plaintiff

ADR

JCS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

C07-01832

ARLEEN ROVERE, individually and on behalf of all others similarly situated,

                Plaintiff,

    v.

RAMBUS, INC.,

                Defendants.

Case No.: C 063945

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; THE CLAYTON ACT; VARIOUS STATE ANTITRUST LAWS, VARIOUS STATE CONSUMER PROTECTION LAWS, COMMON LAW MONOPOLY; AND UNJUST ENRICHMENT**

ORIGINAL
FILED

APR - 2 2007

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

1    Plaintiff Arleen Rovere, by her attorneys, individually and on behalf of all others similarly

2 situated, alleges upon personal knowledge as to herself, and as to all other matters upon information

3 and belief upon, *inter alia*, the investigation made by her attorneys, which included among other

4 things, a review of publicly available information, including but not limited to information obtained

5 by the Federal Trade Commission.

6                              **INTRODUCTION**

7    1.    This action arises from Rambus Inc.'s ("Rambus" and "Defendant") anticompetitive

8 acts and practices whereby Rambus, through deliberate and intentional means, illegally

9 monopolized, attempted to monopolize, coerced competitors to restrain competition and or

10 otherwise engaged in unfair methods of competition in certain markets relating to technological

11 features necessary for the design and or manufacture of common forms of dynamic random access

12 memory ("DRAM").

13    2.    Rambus' anticompetitive scheme involved participating as a member of a group

14 formerly known as the Joint Electron Device Engineering Counsel and now known as the JEDEC

15 Solid State Technology Association ("JEDEC"). The purpose of JEDEC was to influence the

16 evolution, development and adoption by JEDEC of industry standards ("JEDEC standards") for

17 SDRAM and DDR-SDRAM architecture.

18    3.    Rambus actively participated in JEDEC's standard setting proceedings and engaged

19 in a pattern of bad-faith, deceptive conduct, which was exclusionary in nature and calculated to

20 undermine competition and cause harm to consumers nationally. Through its knowing and willful

21 misrepresentations and omissions and other bad faith, deceptive conduct, Rambus created and

22 maintained the materially false and misleading impression that it did not possess, or would not

23 enforce, any relevant intellectual property rights which could undermine JEDEC standards.

24    4.    But for Rambus' fraud, JEDEC would not have adopted standards which

25 substantially overlapped with Rambus' concealed patent claims and or; the terms under which

26 Rambus was later able to enforce its proprietary interests would have been substantially different.

27 Rambus' "patent ambush" also has permitted it to undermine competition and harm consumers in

28 markets for products that incorporate Rambus' patented technologies.

                                                                                    2

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1    5.    The anticompetitive scheme has permitted Rambus to unlawfully coerce

2    manufacturers into a variety of agreements in restraint of trade pertaining to the licensing of DRAM

3    technology. As a direct and foreseeable result, Plaintiff Rovere and the class members she seeks to

4    represent have been injured by being denied a true and competitive choice of DRAM technology

5    and have been forced to pay supracompetitive prices for products with SDRAM and DDR SDRAM

6    technology (including personal computers, certain video devices, and memory chips). Further, as a

7    result of Rambus' unlawful conduct, Rambus has been unjustly enriched at the expense of Plaintiff

8    Rovere and the class members she seeks to represent.

9    6.    Plaintiff seeks treble damages, injunctive relief, and attorneys' fees and costs of suit

10    on behalf of herself and all others similarly situated who indirectly purchased SDRAM or DDR

11    SDRAM for their own use and not for resale during the period of January 1, 1998 through the

12    present (the "Class Period").

13    **JURISDICTION AND VENUE**

14    7.    This complaint is filed and these proceedings are instituted under Sections 4 and 16

15    of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief under federal antitrust laws

16    and to recover treble damages and the cost of suit, including reasonable attorneys' fees under state

17    antitrust and consumer protection laws and restitution under common law, against Defendant for

18    the injuries Plaintiff and members of the class sustained by means of Defendant's misconduct.

19    8.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1337,

20    and by the Clayton Act, 15 U.S.C. §§ 15(a) and 27. The court also has diversity jurisdiction over

21    this class action pursuant to the class Action Fairness Act of 2006, which *inter alia*, amends 28

22    U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where,

23    as here, Plaintiff Gonzales "...... is a citizen of a State different from any defendant and the

24    aggregated amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of

25    interests and costs. 28 U.S.C. §§ 1332(d) (2) and (6).

26    9.    The interstate commerce described in this complaint is carried on, in part, within this

27    District. Venue is proper in this District pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C.

28    § 1391. This Court has jurisdiction over the state law claims pursuant to 28. U.S.C. §§ 1367 and

3

1332.

## PARTIES

### A    The Plaintiff

10.    Plaintiff Arleen Rovere resides in Contra Costa County, California.  During the class period, Plaintiff purchased every type of RAM, including numerous quantities of SDRAM and DDR RAM, which was contained in consumer devices such as desktop PCs, servers, laptops, cameras, cellular telephones and Flash Drives.

### B.    Defendant Rambus

11.    Rambus, Inc. ("Rambus") is a Delaware corporation and maintains its principal place of business at 4440 El Camino Real, Los Altos, California.

12.    Rambus is a developer and licensor of computer memory technologies.  Rambus does not itself manufacture memory devices but licenses its patented technology to others and charges royalties therefore.  Rambus' DRAM architecture is used in memory devices in numerous applications such as game consoles, personal computers, workstations and cellular telephones.

### C.    Co-Conspirators and Doe Defendants

13.    Certain competitors and or memory device manufacturers and potential competitors not made defendants in this complaint have unwillingly participated as coerced co-conspirators in the violations alleged and have performed acts and made statements in furtherance of the violations.  Various other persons, firms, and corporations, the identities of which are presently unknown, have participated as co-conspirators with Defendant in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action on behalf of herself, the general public, and on behalf of all others similarly situated.  Plaintiff seeks to represent the following class:

> **All persons, sole proprietorships, partnerships, corporations and other entities located in the United States who indirectly purchased SDRAM and DDR SDRAM for their own use and not for resale at any time during the period from January 1, 1998 to and including the date of the filing of this complaint.  Excluded from the class are: governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, Defendant and its co-conspirators, along with their respective parents,**

4

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

1    **subsidiaries and or affiliates. Also excluded from this Class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.**

2

3

4    15.    All class members are hereinafter referred to as the "class." Subject to additional

5    information obtained through further investigation and discovery, the foregoing definition of the

6    class may be expanded or narrowed by amendment and or amended complaint.

7    16.    This action has been brought and may properly be maintained as a class action,

8    pursuant to the provisions of the Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

9    Procedure on behalf of all class members:

10    a.    <u>Numerosity</u>:  Members of the class are so numerous that their individual joinder is

11        impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the

12        proposed Class contains thousands and perhaps tens of thousands of members.  The

13        precise number of Class members is unknown to Plaintiff.  The true number of Class

14        members is likely to be known by Defendant, however, and thus, may be notified of

15        the pendency of this action by published notice or other alternative means.

16    b.    <u>Existence and Predominance of Commons Questions of Fact and Law</u>:  Common

17        questions of law and fact exist as to all members of the class.  These questions

18        predominate over the questions affecting individual Class members.  These common

19        legal and factual questions include:

20        i.    Whether defendant's conduct constituted a violation of United States

21            antitrust laws;

22        ii.   Whether defendant was unjustly enriched;

23        iii.  Whether defendant's conduct violated state consumer protection laws;

24        iv.   Whether defendant's conduct caused the price of products using SDRAM or

25            DDR SDRAM technology to be artificially inflated;

26        v.    Whether defendant's conduct caused injury to the business or property of

27            Plaintiff Rovere and the class members and, if so, the appropriate Class-wide

28            measure of damages;

5

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

vi.   The operative time period of the alleged misconduct;

vii.   The nature and extent of Class-wide injury and the measure of damages for that injury; and

viii.   Whether the class is entitled to restitution.

c.   Typicality: Plaintiffs claims are typical of the claims of the class since Plaintiff indirectly purchased SDRAM or DDR SDRAM during the class period, as did each class member. Furthermore, Plaintiff and all class members sustained monetary injury arising out of Defendant's wrongful conduct.

d.   Adequacy: Plaintiff is an adequate representative of the class because her interests do not conflict with the interests of the class she seeks to represent; she has retained counsel competent and highly experienced in complex class action litigation; and she intends to prosecute this action vigorously. The interests of the class will be fairly and adequately protected by Plaintiff and her counsel.

e.   Superiority: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and members of the class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the class individually to redress effectively the wrongs done to them. Even if the class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent and or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

# FACTUAL BACKGROUND OF VIOLATIONS

**A.    The Technology**

17.    The semiconductor industry is comprised of firms that manufacture component computer parts, including memory chips, logic chips (such as microprocessors), and devices or systems utilizing such chips ("DRAM manufacturers").

18.    Memory chips store data and are critical to a broad spectrum of computing devices, including personal computers, workstations, servers and telecommunications equipment.  Memory chips serve as a "holding place" for data that the microprocessor chips process.  The efficiency with which a memory chip can retrieve stored data from a microprocessor is important; a fast microprocessor is of little value unless its memory chips can transmit and store the data in a manner that is compatible with the microprocessor.

19.    On April 18, 1990, Rambus filed a patent application serial number 071510,898 ("the '898 application"), which is alleged to be the essential innovation underlying the development of synchronous DRAM devices.

20.    SDRAM dominated the market throughout the late 1990's and through 2001. SDRAM is found in many contemporary computers and electronic devices, although it is beginning to be used less frequently in favor of DDR and RDRAM.  Currently, JEDEC standards SDRAM, DDR and RDRAM memory chip technologies compete against one another as the various types of DRAM technology incorporated into various electronic consumer goods.

21.    All of these memory chip technology components must be compatible with one another and with the electronic consumer goods' hardware and software.  Thus, DRAM manufacturers and other industry participants standardize these architectures and or technologies through open forums.

**B.    The Open-Standard Policies and Rambus' Fraud on JEDEC**

**1.    JEDEC**

22.    JEDEC — originally known as the Joint Electron Device Engineering Council — is one of several standard-setting bodies affiliated with the Electronic Industries Alliance ("EIA"), a trade association representing all segments of the electronics industry.  JEDEC's primary function

7

is to promote the development and standardization of terms, definitions, product characterization, test methods, manufacturing support functions and mechanical standards for solid state products.

23.     Membership in JEDEC is available to any company, organization, or individual conducting business in the U.S. that manufactures electronic equipment or electronics-related products, or provides electronics-related services.  JEDEC's members include many of the world's top designers and or manufacturers of semiconductors and related products, as well as many of the largest purchasers of such products.

24.     JEDEC's standards are typically proposed, evaluated and formulated at the committee or subcommittee level and then presented for approval to the Board of Directors, which has the final authority to approve or disapprove all proposed standards.

25.     At all relevant times, JEDEC has steadfastly maintained a commitment to promoting free competition within the semiconductor industry.  Thus, JEDEC requires its members to abide by all applicable laws, including laws prohibiting anticompetitive conduct.  In fact, JEDEC's legal guides establish a basic rule that standardization programs conducted by the organization "shall not be proposed for or indirectly result in restricting competition, giving a competitive advantage to any manufacturer, [or] excluding competitors from the market."

26.     Consistent with its commitment to promoting unfettered competition, at all times relevant herein, JEDEC also has maintained a commitment to avoid, where possible, the incorporation of patented technologies into its published standards, or at a minimum to ensure that such technologies, if incorporated, will be available to be licensed on royalty-free or otherwise reasonable and non-discriminatory terms.  Toward this end, JEDEC has implemented procedures designed to ensure that members disclose any patents, or pending patent applications, involving the standard-setting work being undertaken by the organization.

27.     JEDEC's patent disclosure obligations were commonly known throughout the entirety of Rambus' involvement in the organization, from late 1991 through mid-1996.  Further, in October 1993, JEDEC adopted a provision which was added to its manual whereby all meetings of the pertinent JEDEC subcommittee routinely commenced with a statement by the chairperson underscoring the existence of such disclosure obligations.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

28.     While JEDEC does not altogether prohibit the use of patented items in the standards that it promulgates, the JEDEC manual does mandate that the use of such items "be considered with great care."

29.     The policies, procedures and practices existing within JEDEC throughout all relevant times imposed upon JEDEC members certain basic duties with regard to the disclosure of relevant patent-related information and the licensing of relevant patent rights:

a.     First, to the extent any JEDEC member knew or believed that it possessed patents or pending patent applications that might involve the standard-setting work that JEDEC was undertaking, the member was required to disclose the existence of the relevant patents or patent applications and to identify the aspect of JEDEC's work to which they related.

b.     Second, in the event that technologies covered by a member's known patents or patent applications were proposed for inclusion in a JEDEC standards, the member was required to state whether the technology would be made available either "without compensation" or under "reasonable terms and conditions that are demonstrably free of ay unfair discrimination."  Absent the member's agreement to one of these two conditions, the JEDEC rules would not allow the technology to be incorporated into a proposed standard.

**2.     JEDEC standardsization of Synchronous DRAM**

30.     Within JEDEC, the committee responsible for the developing standard relating to memory devices is called JC-42 Committee on Solid State Memories ("JC-42"), which was comprised of several subcommittees.  For purposes of this complaint, the key subcommittee was the JC-42.3.  Subcommittee on RAM Devices ("JC-42.3").

31.     Beginning in or about 1990, JC-42.3 began work on standards relating to the design and architecture of synchronous DRAM or "SDRAM".  During the 1990s, JEDEC issued several SDRAM-related standards, the first of which was published in November 1993.  In August 1999, JEDEC published a substantially augmented SDRAM standard, which introduced a second generation of SDRAM.  This second generation standard became known as "double data rate" or

9

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

1    "DDR SDRAM".

2        32.    In 1991, JEDEC began developing industry-wide technical open standards to ensure

3    that different synchronous DRAM technologies, including SDRAM and DDR SDRAM, would be

4    compatible with each DRAM manufacturer's architecture.

5        33.    The process for the JC-42.3's adoption and publication of standards proceeded as

6    follows:

7        a    At regularly scheduled meetings, JC-42.3 members were allowed to make

8          presentations concerning specific concepts and or technologies they proposed for

9          inclusion in a standard under development.

10        b.    Such presentations generally were accompanied by written materials, which, in

11          addition to being shared with all members present at the meetings, were reproduced

12          and attached to the meeting minutes.

13        c.    Before any proposal could be considered for adoption, it had to be presented a

14          second time at a later subcommittee meeting.

15        d.    At that point, a member could move that the proposal be presented for approval

16          through a formal ballot process.  These ballots contained the following language:

17          "If anyone receiving this ballot is aware of patents involving this ballot, please alert

18          the committee according to your voting response."

19        e.    Votes were then tabulated at the subsequent meeting of the subcommittee, at which

20          time members voting "No" were required to explain their opposition.

21        f.    While a two-thirds majority was technically required, proposals rarely passed

22          without a consensus of all voting members.

23        g.    Individual proposals, once approved by JC-42.3 were often held at the subcommittee

24          level until a complete package of related proposals was ready to be forwarded to the

25          Council for final ratification.

26        34.    During the JC-42.3 committee meetings, which Rambus regularly attended, matters

27    concerning the development of synchronous DRAM technologies, later to be announced as the

28    industry-standards SDRAM and DDR SDRAM, were voted on by members by way of a ballot, in

1  accordance with JEDEC's general practices for adopting standards.

2  **C.    Rambus' Scheme to Capture the SDRAM and DDR SDRAM Standards**

3        35.    On April 18, 1990, Rambus filed its first DRAM-related application with the United

4  States Patent and Trademark Office ("PTO"), Application No. 0715 10,898 (hereinafter "the '898

5  application").

6        36.    Rambus joined JEDEC in early 1992, and used the various JEDEC sub-committee

7  forums to promote its RDRAM technologies. Rambus preferred JC-42.3 adopt Rambus' RDRAM

8  technology as the industry standard for DRAM. However, shortly after becoming involved in

9  JEDEC, it became apparent to Rambus that JC-42.3 was committed to developing a DRAM

10  standard other than RDRAM called SDRAM.

11        37.    In February 1992, Rambus engineer William Garrett represented Rambus at its first

12  JEDEC meeting as a member. Following the meeting, Garrett reported to his supervisors that

13  SDRAMs were inevitable and that SDRAM could be standardized sooner than expected. To hedge

14  its bets, Rambus came up with an alternative business plan: rather than try to convince JEDEC to

15  adopt RDRAM as the appropriate standard, Rambus would instead ensure JEDEC adopted a type of

16  SDRAM that would match a series of patents that Rambus would hold but not disclose to JEDEC.

17  This way, Rambus could achieve the goal of charging high royalties even if the DRAM industry

18  were to adopt as its standard something other than RDRAM.

19        38.    On March 5, 1992, Rambus filed further papers with the PTO. Rambus broke out

20  portions of '898 applications into 10 divisional patent applications, each of which "claimed priority

21  back" to the '898 application and to its April 1990 filing date. The original '898 application and

22  these 10 divisional applications, in turn, gave rise to numerous other amended, divisional, or

23  continuation patent applications — technically the "progeny" of the '898 application. Thus, each

24  Rambus patent application in the '898 "family" — or each of the '898 application's "progeny" —

25  claimed priority back to the '898 application. Consequently, 111 of the patent applications in the

26  '898 family contained the same specification and drawings as were contained in the '898

27  application itself.

28        39.    On March 25, 1992, Rambus' Executive Vice President, Allen Roberts, and outside

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1  counsel, Lester Vincent, discussed the steps Rambus would need to take to be able to accuse

2  manufacturers of JEDEC standards SDRAM of infringement.  Two days later, Roberts and Vincent

3  continued their discussions, this time with Richard Crisp (an engineer who served as Rambus'

4  primary JEDEC representative from May 1992 until Rambus withdrew its JEDEC membership).

5  During this conversation, Vincent advised both Roberts and Crisp there would be equitable

6  estoppel issues if Rambus created an impression before JEDEC that it did not intend to enforce its

7  patents.  However, Vincent went on to say that the situation would be less clear cut if Rambus

8  remained silent.

9       40.    In early April 1992, Crisp requested and received from Vincent abstracts of

10  Rambus' current patent applications.  In April 1992, Crisp attended a JEDEC task group meeting

11  that focused on SDRAMs.  Reporting back to Rambus executives on the meeting's events, Crisp

12  discussed the technologies under consideration, stressing JEDEC's concern with price, and

13  concluding that the group remained set on using SDRAMs.

14       41.    On May 2, 1992, Roberts met with Vincent again to discuss claims that Crisp

15  wanted to add to the patent applications, including a claim covering programmable latency, and

16  potentially, a claim involving programmable patent burst-two technologies that JEDEC eventually

17  included in its SDRAM standards.  Later that month, Crisp spoke with Vincent to discuss

18  additional claims to the divisional application.

19       42.    Also in May 1992, Rambus CEO Tate called a meeting with Rambus executives,

20  including Crisp and Roberts, to discuss the following:

21       a.    How JEDEC SDRAM standards might infringe Rambus' patents;

22       b.    How Rambus might add claims to cover JEDEC's standards; and

23       c.    The nature of Rambus' disclosure duties to JEDEC.

24       43.    In a June 1992 draft of the Rambus 1992-1997 Business Plan, Rambus' CEO, Geoff

25  Tate, summarized Rambus' strategy as follows:

26      [W]e believe that Sync DRAMs infringe on some claims in our filed patents; and
that there are additional claims we can file for our patents that cover features of

27      Sync DRAMs.  Then we will be in position to request patent licensing (fees and
royalties) from any manufacturer of Sync DRAMs.  Our action plan is to

28      determine the exact claims and file the additional claims by the end of Q3/92.
Then to advise Sync DRAM manufacturers in Q4/92. (emphasis added).

44.    In June and July 1992, members of the JC-42.3 subcommittee, including Rambus, voted on whether the SDRAM standards should include a programmable mode register to set CAS latency and burst length. The ballot asked the representative of each voting member whether he or she was aware of any relevant patents. The ballot further asked voting members who were against the proposal to explain their justification and asked specifically about any patent issues that were the basis of their opposition. IBM voted against the proposal because of its concerns there were outstanding patent issues that needed to be resolved. Rambus voted against the proposal, notably omitting reference to its patents and instead citing technical concerns as the basis for its position, such as an inadequate number of power pins.

45.    In August 1992, Rambus assigned Crisp to oversee the development of amended patent claims to provide more complete coverage of SDRAMs. In September 1992, Crisp requested Vincent file an amendment to Rambus' patent application to add additional claims. Crisp provided Vincent a copy of the SDRAM specifications to help frame this amendment.

46.    In the final draft of the July 1992 Rambus Business Plan, dated September 1992, Tate detailed Rambus' scheme:

> Rambus expects that patents will be issued largely as filed and that companies will not be able to develop Rambus-compatible or Rambus-like technology without infringing on multiple fundamental claims of the patents.... Rambus' patents are likely to have significant applications other than for the Rambus Interface.

Tate also wrote: "Sync DRAMs infringe claims in Rambus' filed patents and other claims that Rambus will file in updates later in 1992."

47.    In November 1992, Crisp followed up with Vincent regarding the claim amendments. Further, a December 1992 Rambus planning document references getting a copy of the SDRAM specifications and cross-referencing it to ensure Rambus identified the features it needed to have its patents cover to ensure manufacturers would infringe.

48.    In February 1993, per Crisp's instructions, Rambus worked on adding claims relating to programmable latency and on-chip PLL/DLL.

49.    In March 1993, JC-42.3 voted to send its proposed SDRAM standards, which included both programmable latency and burst length, to the JEDEC council for approval.

13

50.    On May 17, 1993, while the proposed SDRAM standard was awaiting final approval by the JEDEC council, Rambus filed a preliminary amendment to another of its divisional applications. This amendment was described by Rambus personnel as being directed against SDRAM.

51.    One week later, on May 24, 1993, JEDEC formally adopted the SDRAM standard, which incorporated two technologies that Rambus claims its patents covered — programmable CAS latency and programmable burst length.

52.    After the SDRAM standards were adopted, JC-42.3 began work on the next generation of SDRAM, which became known as DDR SDRAM. During this time, Rambus continued to amend its patent applications to cover JEDEC-compliant products. Throughout 1994, Rambus CEO Tate monitored the progress of Rambus' patent activity as it continued to work on amending its applications to focus on future SDRAMs such as DDR.

53.    In September 1994, JEDEC participants made formal presentations relating to DDR SDRAM. Although Crisp knew Rambus was pursuing patent claims that would apply to the proposed DDR SDRAM standards, he omitted to disclose any patents and or patent applications during this meeting. Soon after this meeting, Rambus amended another of its applications, this time the 08/22,646 application (the '646 application).

54.    In April 1995, internally at Rambus, Tate reiterated his objective of getting royalties from competitive memory that used Rambus' technology. In May 1995, Crisp recommended that Rambus continue to keep its patent position a secret. Crisp explained that he did not want to alert JEDEC of a potential problem it could work around. Throughout the summer of 1995, Crisp participated in work to enhance Rambus' claim coverage, which resulted in the further amendment of one of Rambus' numerous patent applications.

55.    After a subsequent JEDEC committee meeting, Crisp reported to various Rambus executives in an e-mail dated June 15, 1995, "It is essential that we be absolutely sure we have the standard adequately covered by patents. I am more convinced of this than ever."

56.    One week after Rambus' October 1995 patent amendment, Rambus received a JC-42.3 survey ballot on future SDRAM features. The ballot asked whether members thought certain

14

1 features should be included in the standard. Rambus did not vote, and it again failed to disclose the

2 existence of any patent application relating to these proposed features.

3       57.    In Fall 1995, Rambus' new in-house counsel, Anthony Dipenbrock, who, like

4 Vincent, advised Rambus that there was a risk of equitable estoppel based on its participation in

5 JEDEC. Dipenbrock advised withdrawing from JEDEC.

6       58.    At his next JEDEC meeting in December 1995, Crisp made private inquiries

7 regarding JEDEC's patent policy. Based on these discussions, Crisp wrote an email to Rambus

8 executives explaining that it was unacceptable "to not speak up when we know there is a patent

9 issue, to intentionally propose something as a standard and quietly have a patent [in] our back

10 pocket we are keeping secret that is required to implement a standard and then stick it to them

11 later."

12       59.    In December 1995, Rambus' in-house and outside counsel discussed the Federal

13 Trade Commission's consent order in *In re Dell Computer Corporation*, which involved allegations

14 of anticompetitive unilateral conduct occurring within the context of an industry-wide standard

15 setting organization. In January 1996, Rambus' outside counsel advised Rambus that it should

16 terminate further participation in any standard setting body, including JEDEC.

17       60.    On January 11, 1996, Vincent met with Rambus executives, including Tate, Crisp,

18 and Dipenbrock, to discuss Dell and other matters. Rambus attended no further JEDEC meetings

19 after this date. According to Crisp, Rambus was concerned that attendance at future meetings could

20 leave Rambus vulnerable in future litigation. However, during this time frame, Rambus continued

21 building its patent portfolio.

22       61.    On June 17, 1996, Rambus sent JEDEC a letter detailing that it would not be

23 renewing its membership in the various JEDEC committees and subcommittees, including the

24 SDRAM committees. Rambus enclosed a list of Rambus U.S. and foreign patents and stated that

25 Rambus has also applied for a number of additional patents to protect its technology.

26       62.    Rambus omitted from the list it provided JEDEC the only then-issued patent that

27 Rambus believed covered technology under consideration by JEDEC — the '327 patent. Rambus'

28 letter also failed to disclose that Rambus had used information from JEDEC meetings to develop a

15

patent portfolio covering JEDEC's SDRAM and DDR SDRAM standards, as well as failing to

disclosing the patent applications Rambus had filed to implement its strategy.  To the contrary,

Rambus' list of patents identified in the letter related only to patents unrelated to JEDEC's work

and included a cryptic reference to additional patents without suggesting that future patents would

be any more applicable to JEDEC's DRAM standards then were the issued patents on the list.

63.    Though no longer a member of JEDEC, beginning in 1997, Crisp received

information about JEDEC's activities through informants.  These sources provided information on

the features of devices being proposed for standardization.  Crisp shared this information with

Rambus executives and engineers, as well as using this information to continue the amendment of

Rambus' patent applications.

64.    During 1997 and subsequently, Rambus continued to conceal its relevant patent

applications.  This strategic silence prolonged the misimpression created by its prior conduct.

65.    By March 1998, a DDR SDRAM standard incorporating all four of the technologies

that Rambus claims are covered by its patents was approved by JC-42.3.  In August 1999, JEDEC

approved that standard and published it.

66.    By November 1999, Rambus had obtained all four patents it would later assert

against JEDEC-complaint uses.

**D.    JEDEC's Standard-Setting Decisions Resulted from Rambus' Misconduct**

67.    Rambus knowingly defrauded and or misled the members of JEDEC by:  attending

JEDEC meetings, listening to the proposed technology to be included in the JEDEC SDRAM

standard, remaining silent about its pending patent applications during those meetings, and, with

the help of its patent lawyers, obtaining additional patents to cover the features of the JEDEC

SDRAM standards, even as those features were being discussed at Committee JC-42.3 meetings.

Specifically, Rambus urged JEDEC members to incorporate at least four core technologies

(programmable CAS latency, programmable burst length, dual bank designs, and an externally

supplied reference voltage) in what is now known as JEDEC standards SDRAM and DDR, while

concealing its patents and pending patent applications.  This allowed Rambus to enforce its patents

against the very same JEDEC members that were urged to adopt these technologies.

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

68. Rambus' strategy was to cause JEDEC to adopt SDRAM and DDR SDRAM standards incorporating its patents and then to charge those practicing the standards royalties of it's choosing. But for Rambus' deceptive course of conduct, JEDEC either would have excluded Rambus' patented technologies from the JEDEC DRAM standards, or would have demanded certain assurances and an opportunity for *ex ante* licensing negotiations.

69. Indeed, the one time JEDEC members had advance knowledge a Rambus patent was likely to cover a standard under consideration; the members took deliberate steps to avoid standardizing Rambus' technology.

70. JEDEC members were highly sensitive to costs and considered the potential costs of patents in weighing different alternatives. Knowledge of the potential total cost of payments to Rambus of several billions of dollars based on the undisclosed patents would have impacted the standards adopted by JEDEC.

71. Alternative technologies were available when JEDEC chose the Rambus technologies and could have been substituted had Rambus disclosed its patent position.

72. However, JEDEC lacked knowledge of Rambus' patent position until Rambus filed its first patent infringement suit against a producer of JEDEC compliant DRAMs in early 2000. After that, it took time for the information to be disseminated and evaluated. Each JEDEC member individually needed to explore alternatives — such as licensing and possible design changes — to determine how to proceed. Only after this was done could JEDEC members begin to try to agree on a revised standard.

73. By 2000, the DRAM industry was locked into SDRAM and DDR SDRAM standards. Changing SDRAM to work around Rambus' patents in 2000 would have presented significant financial and technical difficulties. The time and costs it would have taken to redesign SDRAMs and their complements to avoid Rambus' claimed patents would have been prohibitive. Further, even assuming perfect knowledge of Rambus' patent claims, manufacturers could not have begun to immediately design and implement responsive changes until the industry agreed on how the standard would be changed.

74. Consequently, high direct switching costs, combined with significant delays from

17

1  revising standards and reworking products, rendered it infeasible to change the SDRAM and DDR

2  SDRAM standards to avoid Rambus' technology.

3  **E.    Rambus' Unlawful Licensing Scheme**

4      75.    The purpose and effect of Rambus' misconduct was to coerce DRAM manufacturers

5  into unfair and deceptive license agreements after they were locked in to manufacturing the JEDEC

6  standards SDRAM and DDR architecture.

7      76.    At no time during its involvement in JEDEC did Rambus disclose to the

8  organization that it possessed a patent that purported to cover use of a specific technology proposed

9  for inclusion in the JEDEC SDRAM standards.  On the contrary, Rambus' very participation in

10 JEDEC, coupled with its failure to make required patent-related disclosures, conveyed the

11 materially false and misleading impression that JEDEC, by incorporating into its SDRAM

12 standards technologies openly discussed and considered during Rambus' participation in the

13 organization, was not at risk of adopting standards that Rambus could later claim to infringe upon

14 its patents.

15     77.    In late 1999, Rambus began contacting all major DRAM and chipset manufacturers

16 worldwide asserting that, by virtue of their manufacture, sale and or use of JEDEC standards

17 SDRAM, they were infringing upon Rambus' patent rights, and inviting them to contact Rambus

18 for the purpose of promptly resolving the issue.

19     78.    Rambus then entered into license agreements with seven major DRAM

20 manufacturers:  Matsushita Electric Industrial Co., Ltd.; Elpida Memory, Inc; Samsung Electronics

21 Co.; NEC Corporation; Toshiba America Inc.; Oki Electric Industry Co.; and Mitsubishi

22 Electronics America Inc.  Pursuant to these licenses, Rambus allowed each company to use those

23 aspects of its technology necessary for the design and manufacture of JEDEC complaint SDRAM.

24 In exchange, each company agreed to pay Rambus ongoing royalties reflecting 0.75% of revenues

25 associated with the manufacture and sale of SDRAMs and 3.5% of revenues associated with the

26 manufacture and sale of DDR SDRAMs.  By comparison, Rambus typically licenses all of the

27 information needed to develop RDRAM memory at royalty rates ranging up to a maximum of

28 approximately 2.5% of revenues.

18

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

79.    The foregoing licensing scheme concocted by Rambus was economically irrational, as the costs of using DDR are significantly less than the costs associated with RDRAM. As such, it makes little or no economic sense for Rambus to have offered RDRAM technology at royalty levels well below the rate at which it was offering "its" SDRAM and DDR technologies. Instead, Rambus' royalty scheme was designed with the purpose and effect of coercing memory chip manufacturers to adopt RDRAM to avoid having to pay exorbitant royalties for SDRAM and DDR technologies, such that Rambus' dominance over the relevant market would be cemented.

80.    In public statements addressing why Rambus charged higher royalty rates for the older and less costly SDRAM and DDR technology, Avo Kandjian, Rambus' Vice President of worldwide marketing, openly stressed that "since DDR is competing with Rambus [DRAM], we felt justified in charging a higher rate."

81.    After disclosing its patents, Rambus stated publicly that it would demand even higher royalties from any DRAM manufacturer that refused to license the Rambus patents and instead chose to litigate. Rambus also publicly threatened that it might simply refuse to license its patents to any DRAM manufacturer that was unsuccessful in litigation.

**F.    Rambus' Lawsuits Against Competitors**

82.    Rambus lodged patent infringement actions against several DRAM manufacturers.

83.    In late 2000, Rambus sued Infineon Technologies AG, a manufacturer of semiconductor memory devices, in the U.S. District Court for the Eastern District of Virginia for infringement of four patents. Infineon counterclaimed, alleging Rambus committed fraud under Virginia state law by failing to disclose to JEDEC its patents and patent applications related to the organization's SDRAM and DDR SDRAM standards, as required by JEDEC's rules. During trial, Judge Payne granted judgment as a matter of law (JMOL) for Infineon, holding that Infineon did not infringe Rambus' patents. The jury later found Rambus liable for fraud associated with JEDEC's standard-setting activities on SDRAM and DDR SDRAM technologies. In response to post-trial JMOL motions by Rambus, The court set aside the jury's verdict of fraud regarding the DDR SDRAM technology, but let stand the fraud verdict regarding the SDRAM technology. The court then issued an injunction against Rambus and awarded attorney fees to Infineon. Both

19

1 | Rambus and Infineon appealed to the Federal Circuit.

2 |     84.    In a 2-1 opinion, the U.S. Court of Appeals for the Federal Circuit vacated the

3 | JMOL of non-infringement and remanded the case for consideration under a revised claim

4 | construction. In addition, The court reversed the denial of JMOL that had allowed the SDRAM

5 | fraud verdict to stand, holding that clear and convincing evidence did not support the implicit jury

6 | finding that Rambus breached a duty to disclose its patents and or patent applications as required by

7 | JEDEC's rules. Finally, the Federal Circuit upheld the district court's decision to set aside the

8 | DDR SDRAM fraud verdict. These holdings rendered the injunction against Rambus moot, and

9 | required the Federal Circuit to vacate and remand the award of attorneys' fees for reconsideration.

10 |     85.    Following remand, Infineon moved to compel production of various documents that

11 | Rambus was withholding on the basis of attorney-client and work product privileges under the

12 | "crime/fraud exception" to the attorney-client privilege. In an earlier motion, the district court had

13 | concluded that Rambus had implemented a document retention policy, in part, for the purpose of

14 | getting rid of documents that might be harmful in litigation.

15 |     86.    On May 18, 2004, the district court entered a second order compelling Rambus to

16 | produce additional documents. Under this order, The court held that the crime/fraud exception

17 | extends to materials and or communications created in planning, or in furtherance of, spoliation of

18 | evidence. The court also found that Rambus' intentional destruction of documents was an integral

19 | part of its licensing and litigation strategy. The court then required Rambus to produce certain

20 | documents that Rambus had claimed were privileged, and allowed Infineon to conduct discovery

21 | on the appropriate sanctions for Rambus' behavior.

22 |     87.    In March 2005, at the conclusion of a bench trial, Judge Payne orally dismissed

23 | Rambus' patent claims against Infineon. The court found that Infineon had proven, by clear and

24 | convincing evidence, that Rambus possessed unclean hands and that Rambus had engaged in

25 | extensive spoliation of evidence. Before Judge Payne issued a written opinion setting forth his

26 | findings, however, Rambus and Infineon settled all of their pending litigation, including the case

27 | before Judge Payne.

28 |     88.    The Infineon litigation was only one of many cases involving Rambus and the major

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1  semiconductor companies.  The other cases have yet to reach a resolution; but a brief summary of

2  them is as follows:

3        a.     In *Hynix Semiconductor, et al. v. Rambus Inc.*, the federal district court for the

4                  Northern District of California held a two-week trial on Hynix's unclean hands

5                  defense to Rambus' patent infringement claims.  Judge Whyte issued an opinion on

6                  January 4, 2006, concluding that Hynix's defense failed, after finding that Rambus

7                  did not engage in unlawful spoliation of evidence and that the evidence presented

8                  does not bear out Hynix's allegations that Rambus adopted its Document Retention

9                  Policy in bad faith.  On April 24, 2006, a jury found that Hynix infringed Rambus'

10                  patents and awarded Rambus damages of $307 million.  On July 17, 2006, Judge

11                  Whyte granted summary judgment to Rambus on Hynix's claims based on breach of

12                  contract, promissory estoppel, and constructive fraud but denied summary judgment

13                  for Rambus on Hynix's claims based on allegations of actual fraud.  The court also

14                  determined that a breach of the JEDEC disclosure policies, without more, cannot

15                  give rise to antitrust liability but it ruled that "Hynix is not barred from asserting that

16                  Rambus' overall course of conduct, which may include the circumstances and intend

17                  behind its decision to not disclose its patents and patent applications, violated

18                  antitrust laws."  *Hynix Semiconduct, Inc. v. Rambus, Inc.* N. CV-00-20905 RMW,

19                  2006 WL 2038357, at *509 (N.D. Cal. July 17, 2006).  Hynix's remaining

20                  contentions that the patents are unenforceable have not yet been tried.

21        b.     In *Micron v. Rambus*, currently pending in the U.S. District Court for the District of

22                  Delaware, a Special Master recently issued recommendations to The court on the

23                  disposition of Micron's motion to compel.  Micron sought the production of certain

24                  privileged documents pursuant to the crime/fraud exception.  In his report to the

25                  judge, the Special Master found that the exception did not apply, in part because

26                  there was no evidence of fraud.  That finding, in turn, rested on an analysis of

27                  JEDEC's rules, similar to the analysis set forth in the Federal Circuit's Infineon

28                  decision.  The district court affirmed that analysis and conclusion, based on

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1    Virginia's state fraud law.

2    c.    In *Samsung v. Rambus*, the U.S. District Court for the Eastern District of Virginia

3    recently concluded that Rambus had engaged in spoliation of evidence by destroying

4    documents likely to be relevant at the time when Rambus anticipated or reasonably

5    should have anticipated litigation. Ruling in the context of Samsung's motion for an

6    award of attorney's fees, The court found that Rambus planned for litigation

7    throughout 1998 and 1999 and "as part of the plan…implemented a pervasive

8    document destruction program" that targeted "discoverable documents." *Samsung*

9    *Elects. Co. v. Rambus Inc.*, No. 3:05-CV-00406-REP, 2006 WL 2038417 at *42

10    (E.D. Va. July 18, 2006). The court deemed the contrary ruling in Hynix "not

11    persuasive." *Id.* at *38.

12

**G.    Decision of the Federal Trade Commission (*In the Matter of Rambus. Inc.*, Docket No.**

13    **9302)**

14    89.    On August 2, 2006 the Federal Trade Commission released its unanimous decision

15    that Rambus unlawfully monopolized the markets for four computer memory technologies that

16    have been incorporated into industry standards for DRAM chips.

17    90.    In June 2002, the FTC had charged Rambus with violating federal antitrust Laws by

18    deliberately engaging in a pattern of anticompetitive acts to deceive JEDEC, which caused or

19    threatened to cause substantial harm to competition and consumers. The FTC complaint alleged

20    that JEDEC "maintained a commitment to avoid, where possible, the incorporation of patented

21    technologies into its published standards, or at a minimum to ensure that such technologies, if

22    incorporated, will be available to be licensed on royalty-free or otherwise reasonable and non-

23    discriminatory terms." According to the FTC complaint, Rambus nonetheless participated in

24    JEDEC's DRAM standard-setting activities for more than four years without disclosing to JEDEC

25    or its members that it was actively working to develop, and possessed, a patent and several pending

26    patent applications that involved specific technologies ultimately adopted in the standards. The

27    charges were litigated in an administrative trial and were dismissed by the ALJ in February 2002.

28    91.    In overruling the ALJ decision, the FTC found that, through a course of deceptive

22

1  conduct, Rambus was able to distort the critical JEDEC standards-setting process and engage in an

2  anticompetitive "hold up" of the computer memory industry.  The FTC held that Rambus' acts of

3  deception constituted exclusionary conduct under Section 2 of the Sherman Act and contributed

4  significantly to Rambus' acquisition of monopoly power in the four relevant markets.

5          92.     The FTC unanimous opinion states, "We find that Rambus' course of conduct

6  constituted deception under Section 5 of the FTC Act.  Rambus' conduct was calculated to mislead

7  JEDEC members by fostering the belief that Rambus neither had, nor was seeking, relevant patents

8  that would be enforced against JEDEC-compliant products.... Under the circumstances, JEDEC

9  members acted reasonably when they relied on Rambus' actions and omissions and adopted the

10  SDRAM and DDR SDRAM standards."

11          93.     "Through its successful strategy, Rambus was able to conceal its patents and patent

12  applications until after the standards were adopted and the market was locked in," states the

13  opinion.  "Only then did Rambus reveal its patents — through patent infringement lawsuits against

14  JEDEC members who practiced the standard."

15          94.     Finding violations of Section 2 of the Sherman Act, the FTC stated: "Rambus

16  engaged in exclusionary conduct that significantly contributed to its acquisition of monopoly power

17  in four related markets.  By hiding the potential that Rambus would be able to impose royalty

18  obligations of its own choosing, and by silently using JEDEC to assemble a patent portfolio to

19  cover the SDRAM and DDR SDRAM standards, Rambus' conduct significantly contributed to

20  JEDEC's choice of Rambus' technologies for incorporation in the JEDEC DRAM standards and to

21  JEDEC's failure to secure assurances regarding future royalty rates — which, in turn, significantly

22  contributed to Rambus' acquisition of monopoly power."

23          95.     In a separate concurring statement, Commissioner Jon Leibowitz wrote, "Rambus'

24  abuse of JEDEC's standard-setting process was intentional, inappropriate, and injurious to

25  competition and consumers alike."  He stated that Rambus' conduct not only ran afoul of the

26  antitrust laws, but also constitutes an unfair method of competition in violation of the broader reach

27  of the FTC Act.

28          96.     The FTC found that Rambus had monopoly power in five relevant product markets

23

1   involving technologies incorporated in DRAM electronic memory devices:  (1) the latency

2   technology market; (2) burst length technology market; (3) the data acceleration technology

3   market; (4) the clock synchronization technology market; and (5) a market collectively, of all

4   technologies falling within any of the above markets.  The FTC also found that the relevant

5   geographic market is the world.

6          97.    The FTC found that Rambus had acquired and held over 90% of the market share in

7   the relevant markets.

8          98.    The FTC found that Rambus' conduct caused competitive harm in the form of

9   reduced DRAM output and unreasonably high DRAM licensing royalty rates.

10         99.    The FTC action tolled the statute of limitations for Plaintiff Rover's claims set forth

11  herein pursuant to 15 U.S.C. § l6(i).

12  **H.    Prior State Court Indirect Purchaser Action**

13         100.   On March 22, 2002, Holiday Matinee, Inc. ("Holiday Matinee") brought a class

14  action the Superior Court of California, Santa Clara County, against Rambus for violations of the

15  Cartwright Act, California Business and Professions Code § 17200 *et seq.*, and unjust enrichment

16  on behalf of all nationwide indirect purchasers of SDRAM, DDR DRAM, and or RDRAM from

17  January 2000 through the present. *Holiday Matinee, Inc. v. Rambus, Inc.*, No. 1-02-CV-806325,

18  Docket No. 0011-000 (Cal. Super. Ct., Santa Clara).  Rambus successfully demurred to this

19  complaint. *Holiday Matinee*, No. 1-02-CV-806325, Docket No. 0042-000 (Cal. Super. Ct Order on

20  Demurrer dated September 23, 2002).  On April 15, 2003, Holiday Matinee filed for a Joint

21  Request for Voluntary Dismissal.  Judge Jack Komar granted the voluntary dismissal on April 17,

22  2003, but noted that The court did not reach the issue of whether the state court had subject matter

23  jurisdiction in view of the presence of possible federal law patent issues.  Holiday Matinee, Inc.

24  filed an appeal on September 5, 2003, in part, for a resolution of the issue of subject matter

25  jurisdiction.  On May 27, 2004, The court of Appeal of California upheld the trial court's dismissal

26  decision by finding that the alleged right to relief depended on the resolution of a question of

27  federal law. *See Holiday Matinee, Inc.*, 118 Cal. App. 4th 1413, 1427 (2004).  The four year statute

28  of limitations applicable to the California causes of action was tolled during the pendency of the

24

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1    Holiday Matinee action, and therefore, this action is timely filed.

2    **I.    Impact of Rambus' Misconduct**

3        101.    The foregoing conduct by Rambus, during and after its involvement in JC-42.3, has

4    materially caused or threatened to cause substantial harm to competition and will, in the future,

5    materially cause and or threaten to cause substantial injury to competition and consumers, absent

6    the issuance of appropriate relief in the matter set forth below.

7        102.    The threatened and or actual anticompetitive effects of Rambus' conduct include but

8    are not limited to:

9        a.    Increased royalties (or other payments) associated with the manufacture, sale or use

10            of SDRAM and DDR-SDRAM technology, which are passed on to class members;

11            and

12        b.    Increases in the price, and or reductions in the use and or output of SDRAM and

13            DDR-SDRAM, as well as products incorporating and or using SDRAMs and or

14            DDR-SDRAMs or related technology, which are passed on to class members.

15        103.    Rambus' unlawful coercive and anticompetitive conduct against its DRAM

16    competitors and potential competitors inflicted a direct economic injury on purchasers of DRAM in

17    the United States by restricting the supply of available competing products and raising the prices of

18    DRAM products.  The coercive conspiracy had the same purpose and effect of a *per se* price fixing

19    conspiracy, in that the prices of DRAM were fixed at artificially high levels, well above what

20    would have been prevailed in the absence of Rambus' unlawful conduct.

21                    **RELEVANT PRODUCT MARKET**

22        104.    For purposes of this complaint, there are five relevant markets:

23        a.    The market for technologies used to specify the length of time — or "latency"

24            period — between the memory's receipt of a read request and its release of data

25            corresponding with the request (hereinafter the "latency technology market").  This

26            market includes programmable CAS latency and any alternative technologies that

27            may be economically viable substitutes for the use of programmable CAS latency in

28            synchronous DRAM design.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

b.  The market for technologies used to specify the number of times information (data) is transmitted between the CPU and memory — *i.e.*, the "burst length"-associated with a single request or instruction (hereinafter, the "burst length technology market"). This market includes programmable burst length and any alternative technologies that may be economically viable substitutes for the use of programmable burst length in synchronous DRAM design.

c.  The market for technologies used to synchronize the internal clock that governs operations within a memory chip and the system clock that regulates the timing of other system functions (hereinafter, the "clock synchronization technology market"). This market includes on-chip DLL technology and any alternative technologies that may be economically viable substitutes for the use of an on-chip DLL in synchronous DRAM design.

d.  The market for technologies used to accelerate the rate at which data are transmitted between the CPU and memory (hereinafter, the "data acceleration technology market"). This market includes dual-edge clock technology and any alternative technologies that may be economically viable substitutes for the use of a dual-edge clock in synchronous DRAM design.

e.  A market comprising, collectively, all technologies falling within any one of the above markets (hereinafter, the "synchronous DRAM technology market"). Technologies used in the design of synchronous DRAM chips, to solve separate but related design issues, may be viewed as economic complements, particularly when they are sometimes licensed together as a package, as is true with the patented Rambus technologies encompassed by the aforementioned product markets. Where such close relationships exist among a group of technologies, all of which are necessary inputs into the design or manufacture of a common downstream product, one may appropriately define a product market encompassing the group of complementary technologies.

105. Rambus held over 90 percent of the market share in these relevant markets.

26

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

## GEOGRAPHIC SCOPE OF RELEVANT PRODUCT MARKETS

106.    Each of the technology-related product markets identified above is worldwide in scope. Technologies encompassed within each of the foregoing product markets are used on a worldwide basis. Technologies originating outside the United States are frequently considered for and used in JEDEC standards, and have been used in both the first and second generation SDRAM standards promulgated by JEDEC. The technologies selected for inclusion in these JEDEC standards, in turn, have been incorporated and used by synchronous DRAM manufacturers throughout the world.

107.    A worldwide market is also appropriate because Rambus, which holds synchronous DRAM-related patents issued in the United States and numerous foreign countries, commonly grants licenses to companies in the U.S. and abroad encompassing rights to use Rambus' patented technologies worldwide.

108.    Alternatively, or in addition, the geographic scope of such product markets might appropriately be defined as the United States if, for example, Rambus' US. patent rights differed significantly from rights recognized in various foreign jurisdictions, or if Rambus otherwise had the ability to vary royalty rates from one jurisdiction to another.

### FIRST CLAIM FOR RELIEF
**(For Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violation of Section 1 of the Sherman Act)**

109.    Plaintiff re-alleges and incorporates each and every allegation set forth in the paragraphs above.

110.    Rambus' conduct as alleged herein violates the antitrust laws of the United States.

111.    The alleged acts, agreements, combinations and conspiracies have caused artificially high prices for SDRAM and DDR SDRAM purchased by consumers who are members of the class. Plaintiff Rovere and the class have suffered damage and face a threatened loss in violation of antitrust law if injunctive relief is not obtained.

112.    To ensure Plaintiff Rovere and the class are no longer harmed in the future by the misconduct as alleged herein, Plaintiff seek injunctive relief in the form of the following:

a.    Rambus be restricted from any new efforts by any means, including, without

27

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

1    limitation, the threat, prosecution, or defense of any suits or other actions, whether

2    legal, equitable, or administrative, as well as any arbitration, mediation, or any other

3    form of private dispute resolution, through or in which Defendant has asserted that

4    any person or entity, by manufacturing, selling, distributing, or otherwise using

5    DRAM, infringes any of Rambus' current or future United States patents (including

6    but not limited to the patents described herein) that were obtained without full and

7    explicit disclosure to JEDEC and the public; and

8        b.    That Rambus employ, at its own cost, an approved compliance officer who will be

9    the sole representative of Rambus for the purpose of communicating Rambus' patent

10    rights relating to any standard or regulations under consideration by (i) any standard-

11    setting organization of which Rambus is a member; and or (ii) any state or federal

12    governmental entity that conducts rulemaking proceedings in which Unocal

13    participates.

### SECOND CLAIM FOR RELIEF
**(Violation of State Antitrust Statutes)**

16        113.    Plaintiff re-alleges and incorporates each and every allegation set forth in the

17    paragraphs above.

18        114.    Plaintiff seeks to enjoin Rambus from engaging in future anti-competitive practices

19    and seek damages as permitted under the antitrust laws of various states as set forth herein.

20        115.    Defendant has violated Arizona Revised Stat. § 44-1401, *et seq.*, with respect to

21    certain markets relating to technological features necessary for the design and manufacturing of

22    SDRAM and DDR SDRAM.

23        116.    Defendant has violated California Business & Professions Code § 16700, *et seq.*,

24    with respect to certain markets relating to technological features necessary for the design and

25    manufacturing of SDRAM and DDR SDRAM.

26        117.    Defendant has violated District of Columbia Antitrust Act, D.C. Code §§ 28-4501,

27    *et seq.*, with respect to certain markets relating to technological features necessary for the design

28    and manufacturing of SDRAM and DDR SDRAM.

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

118.    Defendant has violated Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

119.    Defendant has violated Iowa Competition Law, Iowa Code §§ 553.4, 553.5, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

120.    Defendant has violated Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

121.    Defendant has violated Louisiana Monopolies Law, La. Rev. Stat. Ann. §§51:121 *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

122.    Defendant has violated Me. Rev. Stat. 10 § 1101, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

123.    Defendant has violated Massachusetts Antitrust Act, Mass. Gen. Laws, Chapter 93, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

124.    Defendant has violated Mich. Comp. Laws Ann. §§ 445.772, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

125.    Defendant has violated Minn. Stat. §§ 325D.52, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

126.    Defendant has violated Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to certain markets relating to technological features necessary for the design and manufacturing of SDRAM and DDR SDRAM.

127.    Defendant has violated Nev. Rev. Stat. §§ 59-801, *et seq*., with respect to certain

29

1    markets relating to technological features necessary for the design and manufacturing of SDRAM

2    and DDR SDRAM.

3        128.    Defendant has violated Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to certain

4    markets relating to technological features necessary for the design and manufacturing of SDRAM

5    and DDR SDRAM.

6        129.    Defendant has violated New Jersey Antitrust Act, N.J. Stat. Ann. §§ 5:9-1, *et seq.*,

7    with respect to certain markets relating to technological features necessary for the design and

8    manufacturing of SDRAM and DDR SDRAM.

9        130.    Defendant has violated N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to certain

10    markets relating to technological features necessary for the design and manufacturing of SDRAM

11    and DDR SDRAM.

12        131.    Defendant has violated the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, with

13    respect to certain markets relating to technological features necessary for the design and

14    manufacturing of SDRAM and DDR SDRAM.

15        132.    Defendant has violated North Carolina's antitrust and unfair competition law, N.C.

16    Gen. Stat. §§ 75-1, *et seq.*, with respect to certain markets relating to technological features

17    necessary for the design and manufacturing of SDRAM and DDR SDRAM.

18        133.    Defendant has violated N.D. Cent. Code §51-08.1-02, *et seq.*, with respect to certain

19    markets relating to technological features necessary for the design and manufacturing of SDRAM

20    and DDR SDRAM.

21        134.    Defendant has violated S.D. Codified Laws Ann. § 37-1-3.1, *et seq.*, with respect to

22    certain markets relating to technological features necessary for the design and manufacturing of

23    SDRAM and DDR SDRAM.

24        135.    Defendant has violated Tern. Code Ann. §§ 47-25-101, *et seq.* with respect to certain

25    markets relating to technological features necessary for the design and manufacturing of SDRAM

26    and DDR SDRAM.

27        136.    Defendant has violated Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to certain

28    markets relating to technological features necessary for the design and manufacturing of SDRAM

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1  and DDR SDRAM.

2      137.    Defendant has violated W. Va. Code § 47-18-1, *et seq.*, with respect to certain

3  markets relating to technological features necessary for the design and manufacturing of SDRAM

4  and DDR SDRAM.

5      138.    Defendant has violated Wis. Stat. § 133.01, *et seq.*, with respect to certain markets

6  relating to technological features necessary for the design and manufacturing of SDRAM and DDR

7  SDRAM.

8      139.    Plaintiff and members of the class have been damaged by reason of Defendant's

9  alleged violation of the above Statutes.

10
                              **THIRD CLAIM FOR RELIEF**
11                   **(Violation of State Consumer Protection Statutes)**

12     140.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

13  forth herein.

14     141.    As a direct result of Defendant's anticompetitive, deceptive, unfair, unconscionable,

15  and fraudulent conduct, Plaintiff and members of the class were forced to pay artificially high

16  process for products with SDRAM or DDR SDRAM.  Defendant engaged in unfair competition or

17  unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer

18  protection statues as alleged herein.

19     142.    Defendant has engaged in unfair competition or has committed unfair or deceptive

20  acts or practices in violation of Ariz. Rev. Stat. §§ 44-1521, *et seq.*

21     143.    Defendant has engaged in unfair competition or has committed unfair or deceptive

22  acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

23     144.    Defendant has engaged in unfair competition or has committed unfair or deceptive

24  acts or practices in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann.

25  §§ 501.201, *et seq.*

26     145.    Defendant has engaged in unfair competition or has committed unfair or deceptive

27  acts or practices in violation of Iowa Competition Law, Iowa Code §§ 553.4, 553.5, *et seq.*

28     146.    Defendant has engaged in unfair competition or has committed unfair or deceptive

                                                                            31

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1    acts or practices in violation of Kansas Consumer Protection Act, Kan. Stat. Ann. §§ 50-623, *et seq.*

2       147.    Defendant has engaged in unfair competition or has committed unfair or deceptive

3    acts or practices in violation of Louisiana Unfair Trade Practices and Consumer Protection Law,

4    La. Rev. Stat. Ann. §§51:1401, *et seq.*

5       148.    Defendant has engaged in unfair competition or has committed unfair or deceptive

6    acts or practices in violation of the Maine Unfair Trade practices Act, Me. Rev. Stat. Ann. tit 5,

7    §§205-A, *et seq.*

8       149.    Defendant has engaged in unfair competition or has committed unfair or deceptive

9    acts or practices in violation of the Massachusetts Consumer Protection Act Mass. Gen. Laws

10    Chapter 93A.

11       150.    Defendant has engaged in unfair competition or has committed unfair or deceptive

12    acts or practices in violation of Mass. Gen. Laws, Chapter 93A, *and et seq.*

13       151.    Defendant has engaged in unfair competition or has committed unfair or deceptive

14    acts or practices in violation of Michigan Consumer Protection Act, §§ 445.901, *et seq.*

15       152.    Defendant has engaged in unfair competition or has committed unfair or deceptive

16    acts or practices in violation of Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.67, *et seq.*

17       153.    Defendant has engaged in unfair competition or has committed unfair or deceptive

18    acts or practices in violation of Miss. Code Ann. §§75-21-1, *et seq.*

19       154.    Defendant has engaged in unfair competition or has committed unfair or deceptive

20    acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

21       155.    Defendant has engaged in unfair competition or has committed unfair or deceptive

22    acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*

23       156.    Defendant has engaged in unfair competition or has committed unfair or deceptive

24    acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et*

25    *seq.*

26       157.    Defendant has engaged in unfair competition or has committed unfair or deceptive

27    acts or practices in violation of N.M. Stat. § 57-12-1, *et seq.*

28       158.    Defendant has engaged in unfair competition or has committed unfair or deceptive

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1  acts or practices in violation of New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law

2  §§ 349, *et seq.*

3      159.    Defendant has engaged in unfair competition or has committed unfair or deceptive

4  acts or practices in violation of North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01,

5  *et seq.*

6      160.    Defendant has engaged in unfair competition or has committed unfair or deceptive

7  acts or practices in violation of South Dakota's deceptive trade practices and consumer protection

8  law, S.D. Codified Law §§ 37-24-1, *et seq.*

9      161.    Defendant has engaged in unfair competition or has committed unfair or deceptive

10  acts or practices in violation of Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-

11  101, *et seq.*

12      162.    Defendant has engaged in unfair competition or has committed unfair or deceptive

13  acts or practices in violation of 9 Vt. § 2451, *et seq.*

14      163.    Defendant has engaged in unfair competition or has committed unfair or deceptive

15  acts or practices in violation of West Virginia Code 46A-6-101, *et seq.*

16      164.    Defendant has engaged in unfair competition or has committed unfair or deceptive

17  acts or practices in violation of Wisconsin Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

18      165.    Plaintiff and members of the class have been damaged by reason of Defendant's

19  unfair and or deceptive acts as alleged in this complaint.

20  **FOURTH CLAIM FOR RELIEF**
21  **(Common Law Monopoly)**

22      166.    Plaintiff re-alleges and incorporates each and every allegation set forth in the

23  paragraphs above.

24      167.    Rambus has willfully engaged in predatory and anti-competitive conduct

25  intentionally to obtain monopoly power in the relevant markets in violation of common law.

26      168.    The relevant markets are: (1) the latency technology market; (2) the burst length

27  technology market; (3) the clock synchronization technology market; (4) the data acceleration

28  market; and (5) the synchronous DRAM technology market.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

1     169.    Rambus has willfully acquired and possessed monopoly power in the relevant

2   markets.

3     170.    Rambus' anticompetitive and exclusionary acts and practices, undertaken with the

4   specific intent to monopolize the technology markets relating to technological features necessary

5   for the design and manufacture of a common form of DRAM, constitute illegal attempts to

6   monopolize in violation of common law.

7     171.    Specifically, Rambus achieved and maintained monopoly power through

8   misrepresentations and omissions to JEDEC that allowed Rambus to manipulate the standard-

9   setting process for synchronous DRAM.

10    172.    Plaintiff Rovere and the class suffered injury in their business and property as a

11   result of Rambus' monopoly power and anti-competitive conduct because they have been, and

12   continue to be, forced to buy products incorporating synchronous DRAM at a price that is higher

13   because of the Rambus royalty, because of the expense of trying to avoid Rambus' royalty, or

14   because the market for synchronous DRAM has in other ways been harmed by Rambus' conduct.

15    173.    By illegally subverting the standard-setting process to gain a monopoly, Rambus

16   caused Plaintiff Rovere and the class injury by forcing them to pay substantially more for products

17   using synchronous DRAM than they otherwise would have had to pay in a competitive

18   marketplace.

19    174.    Plaintiff Rovere and the class members are entitled to bring this action and to

20   recover herein compensatory damages, treble damages, the costs of bringing suit, and reasonable

21   attorneys' fees.

22
                              **FIFTH CLAIM FOR RELIEF**
23                                 **(Unjust Enrichment)**

24    175.    Plaintiff re-alleges and incorporates each and every allegation set forth in the

25   paragraphs above.

26    176.    Rambus has benefited and been unjustly enriched by the above-alleged conduct.

27   Rambus intentionally misled a regulatory board to obtain an unjust, anticompetitive advantage.

28    177.    Rambus unjustly obtained a significant benefit as a result of this anticompetitive

34

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

1   conduct, including but not limited to the retention of licensing fees and royalties. These benefits

2   and profits were indirectly retained from Plaintiff Rovere and the class, who paid supracompetitive

3   prices for synchronous DRAM because of Rambus' conduct.

4       178.    The circumstances, as described herein, are such that it would be inequitable for

5   Rambus to retain the ill-gotten benefit without paying the value thereof to Plaintiff Rovere and the

6   class.

7       179.    Plaintiff Rovere and the class are entitled to a constructive trust over Rambus' funds

8   for the amount of its ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair,

9   and inequitable conduct. Plaintiff Rovere and the class may take claims on a *pro rata* basis for

10   restitution.

11                              **PRAYER FOR RELIEF**

12       WHEREFORE, Plaintiff Rovere, on behalf of herself and the members of the class, prays

13   for judgment against the Defendant as follows:

14       A.    The court determine that this action be maintained as a class action under Federal

15           Rule of Civil Procedure 23, determine that the alleged conduct be adjudged and decreed an

16           unreasonable restraint of trade in violation of the Sherman Act, and enter an order enjoining

17           such conduct in the future under Section 16 of the Clayton Act;

18       B.    The court determines that the monopolization and attempted monopolization by

19           Rambus constitutes a violation of the common law;

20       C.    The court determines that Rambus has been unjustly enriched;

21       D.    Judgment be entered against Rambus and in favor of Plaintiff and each member of

22           the class it represents, for damages, restitution, and disgorgement of ill-gotten gains as

23           allowed by law and equity as determined to have been sustained by them, together with the

24           costs of suit, including reasonable attorneys' fees;

25       E.    The class is awarded equitable relief and injunctive relief, including:

26           (1)    That a judicial determination and declaration be made of the rights of

27           Plaintiff Rovere and the class members, and the corresponding responsibilities of Defendant

28           regarding provision of full and accurate information about the patent royalties Rambus has

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**

obtained as a result of its manipulation of the standard-setting process and the role of other parties in the scheme;

(2)    Disgorgement and or a constructive trust upon Rambus' ill-gotten gains, freezing Rambus' assets, and or requiring Rambus to pay restitution to Plaintiff and to all class members all funds required by means of any act or practice declared by this Court to be a violation of state consumer protection laws;

(3)    That Defendant be declared to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to class members of the damages they have suffered and restitution for those damages;

(4)    That Rambus not undertake any new efforts by any means, including without limitation the threat, prosecution, or defense of any suits or other actions, whether legal, equitable or administrative, as well as any arbitration, mediation, or any other form of private dispute resolution, through or in which Rambus has asserted that any person or entity, by manufacturing, selling, distributing, or otherwise using synchronous DRAM infringes any of Rambus' current or future United States patents (including but not limited to the patents described herein) that were obtained without full and explicit disclosure to JEDEC and the public;

(5)    That Rambus employ, at is own cost, an approved compliance officer who will be the sole representative of Rambus for the purpose of communicating Rambus' patent rights relating to any standard or regulations under consideration by (a) any standard-setting organization of which Rambus is a member, and or (b) any state or federal governmental entity that conducts rulemaking proceedings in which Rambus participates; and

(6)    Such other or additional relief as is necessary to correct or remedy the violations alleged in the Complaint.

F.    The class is awarded compensatory damages in an amount according to proof, and that such amount is trebled;

G.    The class is awarded prejudgment and post-judgment interest;

36

H.    That the class be awarded punitive or exemplary damages against Rambus for oppression, fraud, malice, recklessness, and or despicable behavior, in an amount sufficient to punish Rambus and deter others from similar wrongdoing;

I.    For attorneys' fees and costs of suit to the class members to the extent permitted by law; and

J.    For such other and further relief as The court may deem just and proper.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)

1

## DEMAND FOR JURY TRIAL

2      Plaintiff Rovere, on behalf of herself, the class members and the general public, hereby

3  demand trial by jury on all issues so triable.

4  DATED:  3|31|07                                    THE TERRELL LAW GROUP
                                                      AMAMGBO & ASSOCIATES
5                                                     BLACKWELL & BLACKWELL
                                                      LAW OFFICES OF NWAJEI &
6                                                     COMPANY

7
                                            By:    *Reginald Terrell*
8                                                  _____
                                                   Reginald Terrell
9

10                                                  THE TERRELL LAW GROUP
                                                    REGINALD TERRELL SB# 127874
11                                                  223 25th Street
                                                    Richmond, CA 94804
12                                                  Telephone:  510-237-9700
                                                    Facsimile:  510-237-4616
13

14                                                  AMAMGBO & ASSOCIATES
                                                    DONALD AMAMGBO
15                                                  7901 Oakport, Suite 4900
                                                    Oakland, CA 94621
16                                                  Telephone:  510-615-6000

17                                                  BLACKWELL & BLACKWELL
                                                    JUDITH BLACKWELL
18                                                  584 Valla Vista Avenue
                                                    Oakland, CA 94610
19                                                  Telephone:  835-2848

20                                                  Lawrence D. NWAJEI
                                                    LAW OFFICES OF NWAJEI &
21                                                  COMPANY
                                                    4221 Wilshire Blvd., Suite 392
22                                                  Los Angeles, CA 90010
                                                    Telephone:  323-549-0201
23                                                  Facsimile:  323-549-0211

24
                                                    Attorneys for Plaintiff
25

26

27

28

38

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. §1)**